UNITED STATES, Appellee

v

ELBERT F. MANESS, JR., Private First Class, U. S. Army,
Appellant

No. 27,444

April 19, 1974

*David F. Addlestone,* Esquire, argued the cause for Appellant, Accused. With him on the brief were *Arpiar G. Saunders, Jr.,* Esquire, *Colonel Arnold I. Melnick,* and *Captain Gilbert J. Weller.*

*Captain David A. Schlueter* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Lieutenant Colonel Donald W. Hansen, Captain Richard A. Karre,* and *Captain M. Douglas Deitchler.*

## OPINION OF THE COURT

QUINN, Judge:

The issue on this appeal is whether the accused was improperly denied the pretrial investigation required by Article 32, Uniform Code of Military Justice, 10 USC § 832, to his prejudice.

It is apparent that certain assumptions were made by various participants in the pretrial proceedings which have led to assertions on this appeal of putative facts that may not be justifiable. Government counsel, for example, contend that a letter by one of accused's civilian counsel to a United States Senator represented "overt pressure on the military . . . through congressional channels." Another letter, apparently on the letterhead of a group titled "Lawyers Military Defense Committee" and signed by the same counsel, is perceived by appellate defense counsel as serving to put the convening authority on notice "of the presence of civilian counsel in the case," but that letter, while representing it was "written on behalf" of the accused, does not indicate that the author, or any other lawyer of the committee, had been retained by the accused or

was entering a formal appearance for him. Perhaps a formal notice of appearance by counsel should be required as a condition to official recognition of his position as counsel, but we need not attempt to assess fault for obvious deficiencies which, as civilian counsel argued at trial, could be attributed at least in part to conditions in the Republic of South Vietnam where the proceedings were held. We start, therefore, with the fact that at least at the first scheduled Article 32 hearing on February 1, 1972, the investigating officer, Major Johnson, was informed that the accused was represented by civilian counsel, and that he undertook to proceed on that basis.

Arrangements for the first hearing, which was to be held at Long Binh Post, were made on January 27, 1972, by Major Johnson and Captain Mohn, who is described as "requested" or "detailed" military defense counsel. At the time, Major Johnson did not know the accused had retained civilian counsel. In fact, on December 23, 1971, he had retained three civilian lawyers, described in the written retainer as members of the Lawyers Military Defense Committee, as his "chief counsel," and had authorized any

of them to appear for him and "to dismiss detailed . . . military counsel . . . as they deem necessary." Two of these lawyers, Mr. DeNike and Mr. Kopanski, are involved in this case.

Within the committee, the case was treated as DeNike's, but, in his absence, Kopanski was responsible for handling what needed to be done. It may fairly be inferred that Captain Mohn was aware of the retainer and had worked with Mr. DeNike on the case before he arranged the February 1 hearing with Major Johnson, but he said nothing about it to Johnson. At the February 1 hearing, Mohn informed Major Johnson that the accused had civilian counsel. DeNike had left the Republic of South Vietnam on January 29 to obtain a renewal of his visa, as required by local law. Kopanski was engaged in an Article 39(a) hearing in a murder case at DaNang. There is testimony by Kopanski to support a conclusion that Captain Mohn had not informed him or the office of the committee that the hearing would be held in the accused's case on February 1. According to Major Johnson's official report, Captain Mohn requested adjournment of the hearing to February 6 or 7 because "civilian counsel . . . was involved in a court-martial in DaNang and would not return until 5 or 6 February and . . . had not had an opportunity to review the charges." Satisfied that the request was reasonable, Major Johnson adjourned the hearing to February 7.

On February 3, Mohn was relieved as military defense counsel because he had received a "curtailment," apparently a reduction of his tour of duty. Captain Shelton was substituted for him. It appears that the substitution was effected without notice to the accused, his civilian lawyers, or the committee. At the time, Captain Shelton had two cases scheduled for trial on February 7 at Long Binh Post. The trial judge in those cases had directed that both "must be tried" at that time. Kopanski was also counsel in those cases. Proceedings in the murder case in which Kopanski was engaged at DaNang had been recessed on February 3, under an order by the trial judge that contemplated that a deposition of a psychiatrist in the United States would be taken at Fort Gordon,

Georgia, no later than February 14. On learning from Captain Mohn that he was to take over from him as appointed military counsel for the accused and that the Article 32 hearing was set for February 7, Shelton was "surprised." He "thought" that Kopanski would be the accused's civilian attorney and he knew Kopanski would be engaged in another trial that day.

Apparently without first consulting with Kopanski, Shelton talked to Major Johnson on February 3. His testimony indicates that he advised Major Johnson that he and Kopanski were going on trial on February 7. He represented that he told Johnson "we can try for the 10th, but I'm not sure whether the civilian attorney will be there or not" because he "was going up to another trial right after this general court-martial." Major Johnson recorded the conversation somewhat differently in his official report, and there are other differences in his testimony. In the report, he indicated Shelton advised him of his appointment as defense counsel in place of Captain Mohn, and that both he and Kopanski "were involved in a court-martial" that would not be concluded until the 8th or 9th of February; he, therefore, adjourned the hearing until February 10. In his testimony, he said Shelton "requested a delay until after 8 or 9 February," and as there was "general agreement" on the 10th, he reset the hearing for that day. He did not ask Captain Shelton to communicate with civilian counsel, and he did not himself do so. He did not inquire into Captain Shelton's right, as newly appointed military counsel, to represent the accused, in view of the accused's existing representation by civilian counsel. See Article 38(b), UCMJ, 10 USC § 838(b). In his testimony, he stated that he "thought [Captain Mohn, as the appointed defense counsel] . . . was qualified to speak for the defense"; it may be inferred, therefore, that he thought the same about Captain Shelton.

Captain Shelton testified that he first mentioned the Article 32 hearing to Kopanski at about 5:00 or 6:00 p. m. on February 9, while they were awaiting determination of the sentence in the second of the two court-martial trials in which they had been engaged since Feb-

ruary 7. Kopanski, he said, told him "he had a murder trial up at DaNang" and "didn't think . . . he could get back in time for the 10th." Kopanski confirmed this conversation but his account of what he told Shelton about his involvement in the murder trial at DaNang is to the effect that he needed to attend the taking of the deposition in the United States on February 14 and, therefore, he had to make arrangements on the 10th for his departure from Vietnam by the 11th, in order to be at Fort Gordon, Georgia, on February 13 to interview the witness. His request for military transportation had not yet been acted on; if he could not get that transportation, he had to obtain authorization from the Washington office of the committee for travel funds. Shelton advised Kopanski that he had not spoken to any of the witnesses in the accused's case and he was not prepared. Thus, Kopanski and Shelton were convinced that the Article 32 hearing would "have to be continued" a few days until DeNike's return, "mainly" because Kopanski could not be there, "but also because" Shelton was not prepared.

The Article 32 hearing came on, as scheduled, on February 10 at 10:00 o'clock at Long Binh Post. Captain Shelton was the only defense counsel to appear. Major Johnson's report indicates Shelton requested a continuance because Kopanski "was in the United States interviewing witnesses" and he himself had had "insufficient time to review the file." Johnson denied the request, and gave Shelton approximately an hour to review the file. That accomplished, he proceeded with the investigation. In his testimony, Major Johnson modified his account of what transpired at the hearing to indicate that he was "not sure" that he had been advised that Kopanski was already in the United States. He also elaborated on the circumstances of the denial of Shelton's request for a continuance.

It appears that a witness, Blunt, conceded by trial counsel to be the Government's "chief witness," had not been available for examination until that morning. A copy of a statement by Blunt was given to Shelton. Shelton acknowledged that he received the Blunt state-

ment and examined it. The hearing started about 11:00 a. m., and, with a recess for lunch, concluded at about 4:00 p. m.

Kopanski testified that on the morning of February 10, he was in Saigon trying to clear a flight to Georgia. His request for military transportation had been denied, and he had conferred, by telephone, with his home office in Washington. DeNike returned to the committee's office in Saigon about noon. He talked to Kopanski about matters at the office. After a discussion of Kopanski's murder case, which lasted "quite a while," he was informed about the Article 32 hearing in the accused's case. According to Kopanski, he told DeNike that the hearing had been scheduled for that day, but that Shelton was "getting it continued." Either late that day or early the next morning, DeNike learned "to his dismay" that the Article 32 hearing had been concluded. He wrote to the convening authority, setting out the material circumstances, and requested a new Article 32 investigation, with a new investigating officer. On February 20, that request was denied, with the comment that "the Article 32 investigation was delayed not once but *twice* due to other commitments of yourself and Mr. Kopanski." (Emphasis added.)

At an Article 39(a) hearing preceding the trial, DeNike appeared as defense counsel, with Shelton as "his associate." The defense moved for a new Article 32 hearing on the ground that the accused had been denied his right to representation by civilian counsel at the hearing held by Major Johnson. In the course of consideration of the motion, the judge, with the concurrence of trial counsel, remarked that the Government's case would "sink or swim on the testimony of Blunt." In consequence, he offered defense counsel the opportunity to examine Blunt under oath at the Article 39 hearing, if the defense would "waive any defects in the Article 32." Pointing out that if Blunt were to recant his pretrial statements or otherwise "break down," the convening authority might "then perhaps entertain some other disposition of the charges," DeNike refused to accept the proposal. He maintained that it did not assure the accused "the full pa-

noply" of his rights. The defense motion for appropriate relief was then denied. The correctness of that ruling is at issue on this appeal.

 Two apparent misconceptions on the part of the convening authority and Major Johnson provide the framework for consideration of the issue. Both officers knew that the accused had civilian counsel, yet each carried out his responsibility in regard to the proceedings as though he perceived appointed military counsel as the principal or chief defense counsel with authority to obligate the defense to a particular course. Major Johnson specifically conceded that he "thought" that Captain Mohn as appointed defense counsel "was qualified to speak for the defense," and it fairly appears that from his first dealings with Captain Shelton, he regarded him as equally qualified to bind the defense. However, when an accused has civilian counsel, detailed military counsel can remain in the case only if the accused "so desires," and then only as "associate counsel." Article 38, UCMJ. As associate counsel, appointed military counsel is unquestionably a valuable part of the defense team, but his position does not import the same "primacy of authority and responsibility" as the accused's individually selected lawyer. United States v Tavolilla, 17 USCMA 395, 399, 38 CMR 193, 197 (1968). See also United States v Tellier, 13 USCMA 323, 32 CMR 323 (1962).

The second misconception that appears to have influenced the decision of Major Johnson and the convening authority is the idea that designation of a military lawyer as defense counsel automatically operates to establish an attorney-client relationship with the accused. However, there is "more to creating the relationship of attorney and client than the mere publication of an order of appointment." United States v Miller, 7 USCMA 23, 28, 21 CMR 149, 154 (1956). Shelton's testimony indicates that he may not even have been officially appointed defense counsel on February 3, but was merely informed by Captain Mohn that he would be substituted for him. If that is true, then when Shelton telephoned Major Johnson to arrange for postponement of the February 7 hearing, he may not have had color of authority to speak for the defense.[1] The undisputed evidence is that he did not consult with the accused's civilian counsel.

 Assuming Captain Shelton had authority to represent the accused on February 3, he may have acted too precipitously in failing to determine with exactness the existing commitments of civilian counsel, but his fault is not the fault of civilian counsel, and they cannot be charged, as they apparently were, by both Major Johnson and the convening authority, with aborting the February 7 hearing. A commitment to try a general court-martial case that has been ordered to trial by the judge was, in our opinion, an eminently reasonable, not a censurable, ground for postponement of the Article 32 hearing, and counsel should not be charged with causing that delay.

 Neither DeNike nor Kopanski knew that the hearing had been first set for February 1 and then postponed to February 7. Assuming Captain Mohn's handling of the arrangements for the first hearing bound the defense, even without consideration of his position in the defense team, it is clear that Major Johnson understood that Mohn only "felt," but did not know, that civilian counsel would be available on February 7. The evident impreciseness of Mohn's information leaves little doubt that the February 7 date was not selected with the idea that it was unalterable, and the last continuance that would be tolerated. Consequently, when it became evident on February 3 that Captain Mohn had been relieved, or was about to be relieved, as military defense counsel, and that Shelton and Kopanski were to begin the consecutive trials of two general court-martial cases on February 7, it could hardly be concluded that civilian

---

[1] No issue is raised as to the propriety of the substitution of Captain Shelton for Captain Mohn because of the latter's "curtailment" and without the apparent knowledge or consent of the accused and his civilian counsel, so we pass over the matter. See United States v Timberlake, 22 USCMA 117, 46 CMR 117 (1973); United States v Murray, 20 USCMA 61, 62, 42 CMR 253, 254 (1970).

or military counsel were grievously at fault for not being available on February 7. To conclude, as the Government contends, that civilian counsel alone were responsible for postponement of the hearing from February 7 to February 10 borders on the absurd. If fault must be assessed, a substantial part must be attributed to the Government for having, without knowledge of the actual availability of accused's civilian counsel, substituted a military lawyer who was committed to try a general court-martial case on the very morning of the Article 32 hearing of the accused's case.

Turning to the events of February 10, we can agree with Government counsel that Kopanski apparently "had no qualms whatsoever about letting . . . [Shelton] be his spokesman when it came time to ask for another continuance." We can go further and assume that Shelton's discussion of the case with Kopanski in the late afternoon of February 9 was sufficient, under the terms of the accused's retainer, to amount to consent to Shelton's continuance in the case as associate counsel. All that does not gainsay the fact that February 10 was set as the hearing date at a time when civilian counsel's commitments were not known and no real effort had been made to determine them.

Shelton testified, and Major Johnson's testimony is not inconsistent, that when he spoke to Major Johnson on February 3, he told him that Kopanski was "going up to another trial right after this general court-martial," and while they would "try for the 10th," he was "not sure whether the civilian counsel will be there or not at that time." Perhaps Shelton was misleading in his indication that Kopanski was to be engaged in another trial, since Kopanski was only preparing to depart for the United States to attend to the taking of a deposition, but his error does not allow avoidance of the conclusion that the hearing was scheduled without any intention that civilian counsel had to be present or risk the hearing would be held without him. It may be that having learned of the February 10 hearing on the previous afternoon, Kopanski would have been wiser to attend personally to argue the urgency of his preparations to depart the country rather than leave that to Shelton, but his unwisdom, if such it was, does not mean that he was seeking to delay the hearing unreasonably. On the contrary, Kopanski had no knowledge of the earlier dates for which the hearing had been set; during that entire span of time, he was almost continually engaged in trial. If he was to attend the taking of the deposition in the United States on February 14, he certainly had to prepare for his departure. On top of all this, he was not prepared in the accused's case; he was informed that Captain Mohn, the previous appointed defense counsel, had been replaced on February 3 by Shelton; he knew Shelton had been engaged in two trials from February 7 through the late afternoon of February 9. Shelton told him that he had not spoken to any witnesses, and it was apparent he had not "made any preparations for this matter." Considering all these circumstances, it was certainly reasonable for him to conclude, as he did, that the hearing would have to be continued "for a few days" for DeNike's return. From no perspective does the record disclose any intention or purpose on his part to vex or inconvenience the Government, or to force a continuance to suit his or DeNike's convenience, as implied by the convening authority in his denial of the defense motion for a new Article 32 and in the Government's argument before this Court. See United States v Donati, 14 USCMA 235, 239–40, 34 CMR 15, 19–20 (1963).

In United States v Kinard, 21 USCMA 300, 303, 45 CMR 74, 77 (1972), we approved the concept, drawn from earlier cases, that only in " 'an extremely unusual case' " should an accused be " 'forced to forego civilian counsel' " whom he has selected, and be required to proceed with his appointed military counsel. As we read this record, this is not one of those cases. On the contrary, the record impels a conviction that the Article 32 hearing should have been postponed to allow civilian counsel the opportunity to participate.

■ The February 10 hearing was the first time the Government presented for defense examination the one witness upon whose testimony its case would stand or fall. The appointed military

counsel was not prepared. Government counsel observe that he had had the case for a week, but, as we noted earlier, it is doubtful that he had an attorney-client relationship with the accused except for 1 day of that period, and he was also involved in the trial of two other cases. Government counsel scoff at Shelton's representation that he was unprepared for the hearing, but all the evidence supports his contention. True, Major Johnson gave him approximately an hour to acquaint himself with Blunt's statement and other evidence in the case. In United States v Heinel, 9 USCMA 259, 26 CMR 39 (1958), we held that the tender of the opportunity to defense counsel to examine, in the course of the hearing, a previous statement by a material Government witness was not a reasonable alternative to a request for a continuance to study the statement and investigate its facts before examination of the witness. In *Heinel,* counsel was otherwise fully prepared for the hearing; here, Shelton knew nothing about the case, and, in our opinion, in the circumstances disclosed by the record, he could not reasonably be expected to conduct an informed cross-examination of the Government's "chief witness." In short, Shelton's presence at the hearing was insufficient reason to proceed without civilian counsel. We are constrained to conclude, therefore, that the trial judge erred in denying the defense motion for appropriate relief as to the Article 32 investigation.

■ Government counsel contend that the error of the trial judge did not prejudice the accused, and, therefore, his conviction should be affirmed. They maintain that the error affects only a pretrial proceeding, not the integrity of the trial and the verdict. In support of their contention, counsel rely upon our opinion in United States v Mickel, 9 USCMA 324, 26 CMR 104 (1958) in which we differentiated between errors in pretrial proceedings and errors affecting the trial. In that case, the accused did not object at trial to the defect in the pretrial proceedings. Here, the accused did object. Referring to the effect of objection at trial, we said at 327, 26 CMR 107:

> Thus, if an accused is deprived of a substantial pretrial right, on timely objection, he is entitled to judicial enforcement of his right, without regard to whether such enforcement will benefit him at the trial. At that stage of the proceedings, he is perhaps the best judge of the benefits he can obtain from the pretrial right.

It is settled that improper exclusion of civilian counsel from an Article 32 hearing denies the accused a substantial right. United States v Nichols, 8 USCMA 119, 23 CMR 343 (1957). Consequently, *Mickel* supports reversal of the accused's conviction, not the Government's argument to affirm it.

The decision of the Court of Military Review is reversed, and the findings of guilty and the sentence are set aside. The record of trial may be returned to a convening authority, who, in his discretion, may dismiss the charges or order another Article 32 investigation and take such other proceedings, including a rehearing, as may be justified by the investigating officer's report and the evidence. United States v Nichols, supra.

Chief Judge DUNCAN and Senior Judge FERGUSON concur.